[Civ. No. 26376. Fourth Dist., Div. One. July 19, 1983.]

PATRICK J. MARMION, Plaintiff and Appellant, v.
MERCY HOSPITAL AND MEDICAL CENTER,
Defendant and Respondent.

**COUNSEL**

Robert A. Ball and Patrick J. Marmion, in pro. per., for Plaintiff and Appellant.

Jerry M. Leahy for Defendant and Respondent.

**OPINION**

**COLOGNE, Acting P. J.**—Patrick J. Marmion, M.D., appeals a judgment denying his petition for writ of mandate and request for temporary relief, and appeals the order denying his motion to vacate the judgment and enter

a different judgment. Marmion seeks reinstatement to the "OB-Gyn Residency Training Program" at Mercy Hospital and Medical Center (Mercy).

Dr. Marmion was in his fourth and final year of a postgraduate residency training program in obstetrics and gynecology (OB-Gyn). Mercy's residency program is designed as an educational and training program which satisfies the standards of the American Medical Association. A resident who satisfactorily completes the program and receives a favorable recommendation from the program's administrator may sit for board examination; if the resident passes the examination, he becomes certified as a specialist in obstetrics and gynecology.

The relationship between Mercy and a resident is governed by a contract entitled "House Staff Agreement," executed by Marmion and Mercy. Pursuant to this contract, Marmion was to be paid an annual stipend of $16,788, from the period of July 1, 1979, to June 30, 1980. The contract states, in part: "The Parties have entered into this Agreement in good faith and acknowledge their respective ethical and legal obligations to fulfill this Agreement until its expiration date, except in the case where the house officer is unable to do so because of incapacitating illness. The Parties further agree that under no circumstances will either party terminate this Agreement prior to its expiration date without prior notice and without providing the other Party the opportunity to discuss freely any differences, dissatisfactions or grievances that may exist. If he so desires, the house officer may select a member of the staff to accompany him and to participate in the discussion."

The residency program is supervised by attending staff physicians, physician administrators and the "Residency Review Committee" (a subcommittee of the medical education committee of Mercy's medical staff). The minutes of the meetings of September 27, 1979, and October 25, 1979, of the residency review committee indicated Marmion was experiencing certain problems with patient care and interaction with members of the committee. The committee requested that program administrators meet with Marmion about the problems. On November 6, 1979, Dr. James Ahern, then director of Mercy's OB-Gyn training program and Marmion's immediate superior, discussed with Marmion some administrative and medical deficiencies in his performance as a senior resident and explained improvement was needed. Ahern told Marmion unless he improved in these categories, he would not be promoted to chief resident, a requisite position for successful completion of the residency program. For the next several weeks, Marmion demonstrated significant improvement in attitude and performance. As a result, on December 3, 1979, Ahern promoted Marmion to chief resident effective January 1, 1980.

On February 9, 1980, Marmion made a presentation at University Hospital in a weekly medical education forum concerning medical complications following elective abortions. Some doctors in the audience were visibly irritated because of the moral or political overtones of Marmion's antiabortion presentation. When Ahern learned of the presentation, he too was upset because Marmion failed to inform him fully of the presentation's content. Marmion offered this background as a reason for the animosity directed at him, but it is not an issue at this time.

On March 12, 1980, Marmion and another resident had a verbal confrontation with Ahern over Mercy's new policy regarding anesthesia consultations on OB-Gyn patients. Marmion told Ahern he would not comply with the new policy and Ahern responded, "Then you might not be any longer chief resident, and you are fired." Later that afternoon, Marmion met with Dr. George Schaefer, associate director of the OB-Gyn residency program at Mercy, to discuss the situation and to seek advice. Schaefer suggested Marmion apologize to Ahern "or he might be out of the program and not be able to finish his residency." Schaefer later called Ahern and asked him to accept Marmion's apology and to give him another chance. On March 14, 1980, Ahern and Schaefer met with Marmion. Ahern orally notified Marmion that he had been placed on probation, and this was confirmed in writing on March 18, 1980. The conditions of probation or areas to improve were specified in outline form as:

"a. Communication

"(1) good—daily—frequent

"(2) honest

"b. Attendance at conferences

"c. Probationary Chief Resident

"(1) check all schedules with Dr. Schaefer

"(2) check all medical management decisions with Staff and only one

"d. Morale problem"

On March 24, 1980, Dr. Woodbury Perkins, the director of medical education (roughly equivalent to a dean), had a long meeting with Marmion to discuss the differences, dissatisfactions and grievances between Mercy and Marmion. Perkins reminded Marmion his position in the residency program

was already seriously jeopardized. On March 27, 1980, Marmion filed a grievance regarding his placement on probation. This was done pursuant to Mercy's "Policy and Procedures Manual." On the same day, Perkins suspended Marmion from the hospital program and gave him written notice of the fact. He ordered Marmion to vacate the premises and not return except to attend the April 3 hearing on his future in the residency program.[1] While the notice of suspension did not use the word "terminate," it was very precise that the hearing of April 3 would concern itself with his continuation in the residency program.

On April 3, 1980, the OB-Gyn residency review committee met with Marmion. Perkins attended this meeting. Although Marmion could have been represented by legal counsel at the hearing, he chose to have only a staff physician, Dr. Thomas Spethmann, assist his presentation. The chairman of the committee, Dr. John Mayo, stated the committee is concerned with Marmion's inability to function properly as a resident. He stated concern specifically, first, with Marmion's difficulty in accepting authority and following hospital protocol and, "most importantly," with the effect this difficulty has on patient care in the hospital and, second, on the morale of other residents, i.e., "what effect your behavior and attitude is having on the other residents and whether this will affect their ability and responsibility in taking care of patients. This concern, in turn, raises questions about the effects that all this has on the residency program. . . ." Marmion stated these concerns had been communicated to him and that he was placed on "probation for poor communication, poor consultation, and not being prompt in appointments, on rounds and at conferences, and, also, mismanagement of patients [and] . . . intellectual dishonesty." Ahern confirmed Marmion's statement of the charges and indicated poor communication was the primary reason. Both Mercy and Marmion presented evidence and dis-

---

[1]The text of Perkins' letter of March 27 to Marmion states:

"In the interest of the institution and the OB-Gyn Residency Program, you are hereby placed upon suspension with salary as of today, March 27, 1980 at 2:00 p.m. for a period of two weeks. *You are to vacate the premises and not return without my permission,* except you are to attend the meeting on April 3, 1980 to be held in the Clinic Conference Room #2 at 1:30 p.m. expressed in Dr. Mayo's letter to you of March 24, 1980. Your clinical commitments and patient care activities will be handled by other residents in the Department of OB-Gyn.

"*The reason for this suspension is designed in the best interests of your future and the future of the OB-Gyn Residency Program. It is apparent that you have elected to disregard the notice of probation of March 18, 1980 and have not demonstrated change in your behavior during this probationary period. In other words, the need is becoming increasingly clear to point out to you that the program is run according to institutional standards rather than according to your own personal standards.* It is our intent that the institution maintain its responsibility for the management and direction of the program.

"Within one week following the meeting of Dr. Mayo's Residency Review Committee to be held April 3, 1980, I will meet with you to further clarify the terms of your probationary status." (Italics added.)

cussed several patient cases in particular. On several occasions at the hearing, Marmion admitted some of his deficiencies.

For example, Marmion stated: "I will admit to poor communication, but I will not admit to 'intellectual dishonesty.'" Later Marmion stated: "First case, Case No. 1, is a Shirodkar. It says the case illustrates very poor communication, very poor planning on my part, being late for surgery, and that's an acceptable criticism, to me. . . . The patient was scheduled for a Shirodkar, but, due to my tardiness, the patient had a McDonald cerclage placed." Concerning the second patient case, the following discussion occurred:

"DR. MARMION: I'll just admit to the committee right now that I am guilty as charged of poor communication and poor attendance and maybe even poor consultation. I came to the hearing not for those reasons. I came to the hearing to clear up this charge of intellectual dishonesty, and I wish that we could keep the hearing totally to that. Anything else is redundant, because I admit to those charges.

"DR. MAYO: Do you admit to charges of not accepting the authority and recommendations of Dr. Ahern and Dr. Schaefer or consultation?

"DR. MARMION: No.

"DR. MAYO: You have never—

"DR. MARMION: Just on the incidents we have talked about. . . .

". . . . . . . . . . . . . . . . . . . . . . .

"DR. MARMION: Well, you have already asked me that question before, and I answered, 'Yes, I have' with the anesthesia conflict recently.

". . . . . . . . . . . . . . . . . . . . . . .

"DR. MARMION: Okay. Then, you are right, Dr. Fiorica, I did violate protocol in that staff was not consulted, so—

"DR. VEINBERGS: That is my point, too.

"DR. MARMION: That is entirely accurate."

Dr. Mayo, the committee chairman, made clear the residency review committee would make no decisions but only a recommendation to the med-

ical education committee. At the conclusion of the hearing, Marmion's counselor, Dr. Spethmann, indicated the hearing was fair and said he felt "every opportunity was given for him [Marmion] to respond and present what he felt was important. . . ."

On April 10, 1980, the OB-Gyn residency review committee reached a conclusion and unanimously (5-0) recommended Marmion be terminated. On April 14, 1980, the medical education committee met, reviewed Marmion's case and the recommendation of its subcommittee, and after about an hour voted unanimously (10-0-2) to affirm the recommendation of the residency review committee. Marmion was not invited to that meeting, as its purpose was simply to receive, consider and act upon the subcommittee recommendation.

On the evening of April 14, 1980, Perkins telephoned Marmion and advised him of the medical education committee's recommendation to terminate him from the residency program. Perkins informed Marmion he would not act on the committee's recommendation until the next day and offered to accept Marmion's resignation. The next day, April 15, Marmion indicated to Perkins he would not resign. In a letter of April 15, 1980, to Marmion, Perkins stated he had accepted the committee recommendation and notified Marmion he was terminated immediately. In this letter, Perkins also informed Marmion of the review procedures which were available to him.

Pursuant to Mercy's bylaws and the "CMA-CHA Uniform Code of Hearing and Appeal Procedures," Marmion on April 19, 1980, requested a judicial review committee be empaneled to review his termination. In a May 13, 1980, letter to Marmion signed by Dr. George Zorn, Sr., chief of the medical staff, and by Dr. Perkins, Marmion was notified a five-member judicial review committee would be appointed. This letter also stated in detail, giving case names, case numbers and descriptions of facts, the specific "acts or omissions" which formed the basis for Marmion's termination.[2] The detail came under two major categories, "demonstrated inability

---

[2]With patient identification material deleted, the entire text of the letter states:
"Dear Dr. Marmion:
"You will recall that on April 10, 1980, following a meeting on April 3, 1980, at which you were present and were given an opportunity to be heard, the Ob-GYN Residency Review Committee, a subcommittee of the Medical Education Commitee of the medical staff of Mercy Hospital and Medical Center, recommended that you be immediately terminated from the OB-GYN Residency Program; that the Medical Education Committee of the medical staff affirmed and joined in that recommendation on April 14, 1980, and that Woodbury Perkins, M.D., Director of Medical Education, implemented and acted on those recommendations by terminating your participation in the OB-GYN Residency Program on April 15, 1980. On April 19, 1980, you exercised your right to request a hearing before a judicial review committee of the medical staff of the hospital.
"That Committee has been appointed. It is comprised of the following members of the

or unwillingness to function satisfactorily within the structure of the OB-Gyn Residency Program" and "insubordination, disobedience of or resis-

active staff:
"Robert Rowland, M.D. (Chairman)
"Douglas P. Mooney, M.D.
"John Peters, M.D.
"Michael Egan, M.D.
"Edward Pezanoski, M.D.
"The initial hearing has been scheduled on May 22, 1980, at 6:15 o'clock p.m. of said day, at the Administration Board Room of the hospital at 4077 Fifth Avenue, San Diego, California 92103. In the event that the hearing is not concluded on that day, it will be continued from time-to-time until it is concluded.
"The acts or omissions which formed the basis for your termination from the program are as follows:

"I

"You have demonstrated inability or unwillingness to function satisfactorily within the structure of the Ob-Gyn Residency Program in each of the following respects:
"(1) Following meetings with James Ahern, M.D.—Director of the Program, and George Schaefer, M.D. Co-Director of the Program, in October and November, 1979, and again in March, 1980, in which they pointed out to you habitual failure to communicate with them on a frequent basis, your failure regularly to attend conferences and clinics, your disregard of patient care management directions by attending physicians and faculty members (for example patients [three identified]), (Appended), your failure to prepare for and attend conferences and clinics on a scheduled basis, and your failure to check schedules and medical management decisions with faculty members, you failed to maintain continued improvement in those areas, as a result of which you were placed on probation for the second time on March 18, 1980.
"(2) You have created morale problems with other residents by disrupting their schedules and making discriminatory assignments.
"(3) Despite such probationary status, you continued to fail to show improvement in such areas, as a result of which you were placed on suspension on March 27, 1980.

"II

"You have been guilty of insubordination, disobedience of or resistance to authority, and failure to follow program protocols and/or Hospital policies in each of the following respects:
"(1) You have failed to report in detail and completely to Doctors Ahern and Schaefer the conditions of patients on a daily basis and to inform them of problem admissions. Examples can be found in the following cases:
"(a) [Patient identification], in this case you failed to consult with a member of the faculty or attending staff prior to determining whether or not the patient should be delivered vaginally or by Caesarean section.
"(b) In the case of a patient named [patient identification], you failed to obtain preoperative examination and consultation, i.e., 'staffing' with a member of the faculty or attending staff as required before determining the type and appropriateness of major surgery to be performed, especially in an elderly Mexican female. In the same case, you failed to report to either Dr. Ahern or Dr. Schaefer the patient's condition or to seek advice or consultation. In the same case, you failed to advise the surgeon prior to the surgery of the existence of a possible cardiac problem.
"(2) On March 24, 1980, you left the hospital without informing either Dr. Ahern or Dr. Schaefer, or obtaining the permission of either of them to go to the Otay Clinic.
"(3) You have on various occasions made yourself inaccessible to either Dr. Ahern or Dr. Schaefer, or attending staff by disregarding your page or otherwise becoming unavailable for call, for example, in the case of [patient identification], Dr. Donna Brooks reported to Dr. Ahern a great deal of delay in your seeing this patient because you ignored Dr. Brooks' phone calls. Similarly, in the case of [patient identification], without explanation or justification, and despite repeated calls, you failed to appear for surgery you were scheduled to perform, although the patient had received her anesthesia, as the result of which another

tance to authority, and failure to follow program protocols and/or Hospital policies." In a second letter dated May 21, 1980, Mercy disclosed who it intended to call as witnesses.

---

resident had to be assigned to perform the surgery.

"(4) On March 27, you were placed on suspension in writing by Medical Education with specific instructions 'You are to vacate the premises and not return without permission. . . .' You violated this stipulation on three occasions. Specifically on April 2 you were in the college Building, in the Library, in the parking structure at which time you threatened Dr. David West with a lawsuit if he did not write a proper document in your behalf; on the night of April 4 you were in the hospital on the third floor in the post-partum area at approximately 1:15 a.m. and were seen by Dr. Karl Evelyn, and by Dr. Donna Brooks; early afternoon of April 4, you called Dr. Perkins for permission to come onto the premises, ostensibly to provide some affidavits. Permission was denied and you were told to mail in the affidavits. Your response was that mailing the affidavits was not satisfactory and that you were coming in onto the premises anyway. Approximately 3:00 o'clock that afternoon you entered the Mercy premises, went to the Ob-Gyn Clinic, gave Janet Marlborough—the Charge Nurse in the Clinic—a vial of blood requesting that the blood be sent to the lab for procedures (the blood sample was that of [patient identification], a former clinic patient). On none of these three occasions were you given permission to come on the premises and therefore, in each of these occasions, you violated the terms of suspension.

"The hearing will be conducted pursuant to the procedure outlined in the CMA-CHA Uniform Code of Hearing & Appeal Procedures, as revised in April, 1972, a copy of which has previously been furnished to you.

"The hearing is had for the purpose of inter-professional resolution of the foregoing allegations. Accordingly, neither you nor the Director of Medical Education nor any other person or body representing the Hospital may be represented at any phase of the hearing by an attorney unless the Judicial Review Committee, in its discretion, permits both sides to be represented by legal counsel. However, you may be accompanied by and represented at the hearing by a physician and surgeon licensed to practice in the State of California who, preferably, is a member in good standing of the medical staff of the Hospital. The Director of Medical Education, whose decision prompted the hearing, will appoint a representative from the medical staff to present its recommendations in support of that decision and to examine witnesses.

"Any request for deviation from the CMA-CHA Uniform Code of Hearing and Appeal Procedures should be addressed to the Chairman of the committee, Robert Rowland, M.D., whose address is 2330 First Avenue, San Diego, California, 92103, and must be received by him within 5 (five) days of the receipt date of this notice, so that the committee may act thereon and, if your request is granted, accommodate itself and others involved to the deviation. Any such deviation, if granted, might result in a delay or continuance of the hearing.

"At the hearing, it will be incumbent on the Director of Medical Education to initially come forward with evidence in support of his decision to terminate your participation in the Ob-Gyn Residency Program. Thereafter, the burden will shift to you to come forward with evidence in your support. The Judicial Review Committee is required to rule against you unless it finds that you have proved, by clear and convincing proof, that the action of the Director of Medical Education was arbitrary, unreasonable, or not sustained by the evidence."

The appendix to the letter states:

"[Patient identification]. A patient admitted with a tender abdomen who Dr. Marmion thought should be operated upon immediately. The patient did not appear to be an emergency, and when examined by Dr. Schaefer it was recommended she be watched for 24 hours and scheduled for operation at that time if indicated. Within an hour or two, Dr. Marmion called Dr. Schaefer to say that she was hemorrhaging and that the operative schedule should be broken into for immediate surgery. When asked what the hemoglobin was, Dr. Marmion reported it was down several points, and accordingly, the patient was taken to the operating room immediately. In reality, the patient was not hemorrhaging. During the surgical pro-

The initial judicial review committee hearing date was scheduled for May 22, 1980, but was postponed until May 29, 1980. The hearings continued on June 4 and June 23, and a notice of decision was mailed to Marmion on June 25 sustaining the termination.

On July 2, 1980, Marmion timely filed his notice of appeal to Mercy's board of directors and on July 24, 1980, his appeal was reviewed. By letter dated August 8, 1980, Marmion was advised a special committee of the board had sustained the decision of the judicial review committee.

On March 9, 1981, Marmion filed a petition for writ of mandate and request for temporary relief in the superior court, pursuant to Code of Civil Procedure section 1094.5. He also filed a motion for immediate reinstatement. Mercy filed responsive pleadings and declarations. Marmion's motion for immediate reinstatement was denied on April 6, 1981.

After oral argument by both Marmion and Mercy, the court filed a memorandum of intended decision on June 18, 1981. On June 26, 1981, Marmion filed a request for findings of facts and conclusions of law. In compliance with a court order dated July 1, 1981, on July 21, 1981, Marmion filed proposed findings of fact and a request for specific findings. Mercy filed objections to the proposed findings and proposed alternative findings. The court denied Marmion's request for specific findings and adopted as its findings of fact the memorandum of intended decision previously filed. Judgment denying the writ of mandate and request for temporary relief was filed July 16, 1981, and entered August 25, 1981.

On September 11, 1981, Marmion filed a notice of intention to move for new trial but withdrew it on September 28. He filed a notice of intention to set aside and vacate judgment and enter another and different judgment on September 11, 1981. On October 2, 1981, the court amended its findings of fact by amending the memorandum of intended decision to substitute the term "weight of the evidence" in place of "substantial evidence," assigning the change to clerical error. The court then denied Marmion's motion to set aside and vacate judgment. Marmion appeals.[3]

---

cedure, Dr. Schaefer reported that Dr. Marmion attempted to do surgically incorrect procedures.

"[Patient identification]. In the case of patient . . . , although instructed by Dr. Ahern and Schaefer at about 7:00 am, and again at approximately 10:00 am, and 11:00 am, and at 3:00 pm. to perform a Caesarean section immediately, Dr. Marmion failed to perform the section until approximately 7:00 pm. of that evening.

"[Patient identification]. Dr. Veinbergs advised Dr. Marmion not to do a colpocentesis for an ectopic pregnancy that was already diagnosed. Dr. Marmion did it anyway."

[3]Other necessary facts will be stated in the discussion of the issues.

■ Marmion first contends the administrative record does not support the finding Marmion's inability to function within the structure of the residency training program had a clear adverse effect on the overall quality of medical care provided by Mercy. He contends that before a resident may be terminated from his training program, there must be a showing of some relationship between the criteria used for the termination (i.e., the inability to function within the structure of the residency training program and insubordination) and the resident's ability to provide quality medical care. Marmion further contends the administrative record does not adequately show "a real and substantial danger" that patients treated by him might receive a diminished quality of care at Mercy if he were permitted to continue and complete his residency.

In *Miller* v. *Eisenhower Medical Center* (1980) 27 Cal.3d 614 [166 Cal.Rptr. 826, 614 P.2d 258], the court ruled a hospital bylaw which required a physician applying for staff membership to have the " 'ability to *work with* others' " is not substantively irrational or arbitrary or otherwise violative of an applicant's rights of fair procedure so long as there exists "a demonstrable nexus between the applicant's ability to 'work with' others and the effect of that ability on the quality of patient care provided" (*id.* at p. 628). ■ Stated in other words, a hospital may not deny a physician's application for staff privileges because of the applicant's inability to work with others in the hospital environment unless there is a showing of a "real and substantial danger that patients treated by him might receive other than a 'high quality of medical care' at the facility" (*id.* at p. 629).

■ *Miller* is distinguishable, however, because that case involved a physician applying for hospital staff privileges and not a doctor admitted into a residency training program. "A resident is a physician who is receiving postgraduate training in a medical specialty by treating the sick and afflicted in a hospital, for which he is compensated not by the patients but by the hospital (see Bus. & Prof. Code, § 2147.5). Thus a resident is a categorical hybrid, being both an employee [citation] and a student [citation]." (*Ezekial* v. *Winkley* (1977) 20 Cal.3d 267, 282 [142 Cal.Rptr. 418, 572 P.2d 32], Mosk dis.)

"A staff physician treats *his* patients at the hospital. He has full authority to prescribe the patients' treatment, he is subject to no supervision during the course of treatment, and he generally bears full responsibility for negligence. The situation of the medical resident is entirely different. He treats his *employer's* patients, by assignment of his employer, subject to supervision by the hospital's chief of surgery, and because of the employer-employee relationship the hospital is liable for his negligence under accepted principles of respondeat superior. [Citation.]

"In terms of the patient's frame of reference, when he engages a physician to treat an ailment he relies upon his doctor's expertise, not that of the hospital. When a patient enters a hospital on his own initiative for treatment, in an emergency or otherwise, he must rely upon the institution for assignment of one of its residents. . . .

"These considerations underscore the importance to the hospital of maintaining control over the training and assignment of its medical residents. When a medical doctor is undergoing his residency, he understands it is a period of training out of which he may have a subjective expectation of qualifying in the future as a skilled expert in surgery or a related discipline. But to the chief of staff of the hospital this same period involves the welfare and reputation of the hospital. He must be able to select and retain only those residents who in his expert opinion will best serve the interests of the hospital and its patients." (*Id.* at pp. 283-284.)

Because a residency training program is inherently different from hospital staff memberships, the hospital's role in patient care as well as its interest in maintaining an effective educational program for all the resident doctors under its supervision require more than just good patient care. A "real and substantial danger" that other than a high quality of medical care will be furnished the patient may be a factor of concern to the hospital. This is not to suggest this is required in every case to justify the termination of a resident because, as noted in the *Ezekial* dissent, the hospital has other interests at stake.

The second reason for which we reject Marmion's reliance on *Miller* is that there, the reason the hospital used to deny Miller's application for staff privileges, his inability to work with others, was vague. In the present case, the grounds were not vague; they were Marmion's poor communication, poor attendance and poor consultation, and his adverse effect on morale. Specific instances of each were documented. Moreover, the specific grounds were oriented toward patient care. Stated in substantially equivalent terms, Marmion could not function satisfactorily within the structure of the OB-Gyn residency program and was insubordinate, disobedient and resisted authority, as specified in the May 13, 1980, judicial review committee letter. We believe the grounds in Marmion's case are much more specific and substantive than the grounds used in *Miller*.

In *Stretten* v. *Wadsworth Veterans Hospital* (9th Cir. 1976) 537 F.2d 361, a case involving the dismissal of a resident, the court recognized the hospital's important interests and stated: "[A doctor] is a professional whose position requires that he work in close coordination with other medical personnel. A hospital staff is highly interdependent, both in the sense that one

doctor depends upon the professional skill of other doctors and in the sense that the collegial nature of the body makes tolerable working relationships an absolute prerequisite to effective staff performance. The necessity for a healthy working relationship is a function of the nature of the work to be done. Incompatible workers on farms, ranches, or in certain types of factories can function reasonably well although even there it is doubtful that full efficiency is achieved. Effective performance by physicians on the staff of a hospital, whose tasks require a high degree of cooperation, concentration, creativity, and the constant exercise of professional judgment, requires a greater degree of compatibility. The Hospital must recognize this necessity. This enhances its interest in quickly dealing with incompetence and debilitating personal frictions. . . .

". . . . . . . . . . . . . . . . . . . . . .

". . . [T]he more important, and perhaps decisive, factor is the perceived inability of Stretten [the resident] to cooperate effectively with his colleagues. The collective opinion that a resident is excessively abrasive would destroy the proper operation of a collegial functionally-integrated group. The decision-maker may give great weight to the group's opinion on this point. [Fn. omitted.] Significantly, this perception is not easily shaken by cross-examination. [Fn. omitted.] The procedural implications of these considerations is that a full adversary hearing is unlikely to be more useful than less elaborate procedures in revealing any flaws that would undermine the case against a terminated resident.

"The ultimate decision-maker must have wide discretion in considering the evidence against a resident. This includes the power to attach great value to the considered opinions of the resident's colleagues. It is bound, however, not to act in bad faith or arbitrarily and capriciously. The resident's interest is important enough that he should have notice of his deficiencies, should have an opportunity to examine the evidence against him, and should be allowed to present his side of the story to the decision-maker. These procedures will insure that all relevant data are before the decision-maker and will allow the terminated resident and any reviewing court to judge whether the decision-maker acted in bad faith or arbitrarily and capriciously. A termination procedure effective for these purposes was followed in this case. We hold that due process does not require a full adversary hearing either before or after termination." (*Id.*, at pp. 368-369.)

Even if Mercy was required to show Marmion's conduct diminished the quality of patient care, the third reason why we reject Marmion's contention is the facts do demonstrate the quality of patient care was in jeopardy by Marmion's behavior even if there was no showing any particular patient

suffered. For example, the testimony, documents and Marmion's admissions clearly show that Marmion frequently failed to communicate and consult with the more experienced OB-Gyn specialists who were responsible for the residency program.[4] Further, Marmion's failure to consult involved much more than the administrative aspects of the program; it also involved medical decisions and treatment of Mercy's patients. Thus, patients were treated by Marmion without the available benefit of additional medical opinions of more experienced doctors who specialized in OB-Gyn. This is the primary purpose of a residency program. Although some of the medical cases analyzed at the hearings demonstrate the patient treated by Marmion could have been adversely affected by Marmion's deficient conduct, we must also consider the effects on prospective patients at Mercy if Marmion was to continue his residency. We believe Marmion's history of admitted failure to communicate, consult and follow known hospital protocol, plus his disobedience and disrespect for his superiors at Mercy indicates future patients may indeed suffer due to Marmion's lack of experience. It is not necessary to wait until a patient dies to find the quality of medical care has suffered.

We conclude it was unnecessary for the court to find Marmion's inability to function within the structure of the residency training program had an adverse effect on the quality of medical care provided by Mercy; nevertheless, such a finding is supported by sufficient evidence.

Marmion contends he was denied his common law right of "fundamental fairness" in the administrative proceedings. Specifically, he contends he lacked (1) prior notice of the proposed action of termination and of the charges, and (2) the opportunity to respond adequately to the decision-maker.

■ A hospital must afford a resident in termination proceedings the common law right of fundamental fairness (*Ezekial* v. *Winkley, supra,* 20 Cal.3d 267, 275). This common law right to a fair procedure requires at least adequate notice of the charges and a meaningful opportunity to respond (*Ezekial* v. *Winkley, supra,* 20 Cal.3d at p. 278). However, courts " 'should not attempt to fix a rigid procedure that must invariably be observed.' " (See *id.* at p. 278.) "[W]hether the procedure is 'fair' in a particular case depends largely on 'the nature of the tendered issue.' " (*Id.* at p. 279.) "Fair procedure does not compel proceedings with the formalities of a court trial. The minimum requirements are described in varying ways and may depend upon the action contemplated by the organization and the effect of that action

---

[4]We do not believe it necessary to present case by case factual details of the evidence presented at the April 3, 1980, hearing before the OB-Gyn residency review committee and of the hearing before the judicial review committee. It is sufficient to say the administrative record was meticulously reviewed by this court.

on the individual." (*Hackethal* v. *California Medical Assn.* (1982) 138 Cal.App.3d 435, 442 [187 Cal.Rptr. 811].) Stated otherwise: "The common law requirement of a fair procedure does not compel formal proceedings with all the embellishments of a court trial [citation], nor adherence to a single mode of process. It may be satisfied by any one of a variety of procedures which afford a fair opportunity for an applicant to present his position. As such, this court should not attempt to fix a rigid procedure that must invariably be observed. Instead, the associations themselves should retain the initial and primary responsibility for devising a method which provides an applicant adequate notice of the 'charges' against him and a reasonable opportunity to respond. [Fn. omitted.] In drafting such procedure, and determining, for example, whether an applicant is to be given an opportunity to respond in writing or by personal appearance, the organization should consider the nature of the tendered issue and should fashion its procedure to insure a *fair* opportunity for an applicant to present his position. Although the association retains discretion in formalizing such procedures, the courts remain available to afford relief in the event of the abuse of such discretion." (*Pinsker* v. *Pacific Coast Society of Orthodontists* (*Pinsker II*) (1974) 12 Cal.3d 541, 555-556 [116 Cal.Rptr. 245, 526 P.2d 253].)

The superior court found Marmion had actual notice of the possibility that his conduct might result in his termination from the training program. Essentially, Marmion challenges this finding.

In *Ezekial* v. *Winkley, supra,* 20 Cal.3d 267, at page 275, the California Supreme Court expressly held a medical resident "is entitled to 'fair procedure' protection *prior to* dismissal from the . . . residency program" (italics added).

A relevant case from the Ninth Circuit Court of Appeals, which relied on *Arnett* v. *Kennedy* (1974) 416 U.S. 134 [40 L.Ed.2d 15, 94 S.Ct. 1633], and *Goss* v. *Lopez* (1975) 419 U.S. 565 [42 L.Ed.2d 725, 95 S.Ct. 729], indicated it may be proper under certain circumstances (such as medical incompetence presenting danger to patients) to terminate a resident before giving the resident notice and a hearing (*Stretten* v. *Wadsworth Veterans Hospital, supra,* 537 F.2d 361, 369, especially fn. 20). However, this would be rare and not the preferred procedure (*ibid.*). (See also *Ong* v. *Tovey* (9th Cir. 1976) 552 F.2d 305, 308.)

In dicta in *Ascherman* v. *San Francisco Medical Society* (1974) 39 Cal.App.3d 623, at page 648 [114 Cal.Rptr. 681], the court stated a hospital may not deprive a physician of staff privileges without granting him minimum due process of law. Following *Silver* v. *Castle Memorial Hospital* (1972) 53 Hawaii 475 [497 P.2d 564] [cert. den. (1972) 409 U.S. 1048 (34

L.Ed.2d 500, 93 S.Ct. 517) and rehg. den. (1973) 409 U.S. 1131 (35 L.Ed.2d 264, 93 S.Ct. 936)], the court stated part of the due process requirement is the doctor "should be given timely notification sufficiently prior to the hearing for him to adequately prepare a defense." (*Ibid.*)

■ Clearly, due process and the common law right of fair procedure require that a medical resident be given notice the hospital is contemplating the most serious disciplinary sanction of termination. Furthermore, this notice, *whether written or oral,* must precede the effective decision to terminate the resident and the resident's opportunity to respond to the decision-maker.

Balancing the competing interests involved (see *Stretten* v. *Wadsworth Veterans Hospital, supra,* 537 F.2d 361, 367-369), we believe this holding is not unreasonable. The resident has significant interests in the continuation of his income and the specialized training and education. He also has an interest in the preservation of his professional and personal reputation. The hospital's interest in preserving a professional, competent, efficient and collegial working environment is extremely important, particularly in light of the effects on patient care. However, providing a resident with advanced notice of his contemplated termination imposes no real burden on the hospital or threat to patient care because the resident may be summarily suspended pending an imminent hearing (see *id.* at p. 369, fn. 20). A third factor to consider is the risk of an erroneous decision to terminate without an opportunity to explain his side of the differences. Although the risk of error may be slight, any potential error could be obviated by giving advanced notice and the opportunity to respond.

■ Applying this rule, we now consider whether substantial evidence supports the court's finding that Marmion received actual notice his conduct might result in his termination from the residency program.

Initially, we note Perkins, the director of medical education, was the Mercy representative who made the ultimate decision to terminate Marmion. The record shows this decision occurred on April 15, 1980, and was based on the committee recommendations following the April 3, 1980, hearing. Thus, our inquiry is, did Marmion receive notice of his contemplated termination before the April 3, 1980, hearing.

The declarations of Perkins and Schaefer, M.D., which are contained in the record, indicate there was ample notice termination was a real possibility[5] unless his behavior changed. He was notified it had not and his

---

[5]*Perkins' declaration states in pertinent part*:

"On or about April 15, 1980, following two placements on probation and one suspension, and after my receipt of recommendations made by two advisory committees of the Medical Staff of the HOSPITAL (namely, the Ob-Gyn Residency Review Committee and the Medical Education Committee), I terminated DR. MARMION from the Ob-Gyn Residency Program of the HOSPITAL.

"It is my understanding that DR. MARMION now takes the position that: 'Petitioner was never notified prior to the date of this (*sic*) discharge that termination was contemplated.' (Paragraph 10, Declaration of Robert A. Ball)

"This statement is false. It is not true that DR. MARMION was never notified prior to the date of his discharge that termination was contemplated.

"DR. MARMION was first placed on probation by Dr. Ahern on November 6, 1979.

"On November 9, 1979, I had a long talk with DR. MARMION concerning the obvious problems he was having with both Drs. Ahern and Schaefer as well as with the attending physicians on the Ob-Gyn service. In this discussion, my notes of our meeting record the following points: DR. MARMION (1) admitted he had used poor clinical judgment, (2) acknowledged that he clashed with Ahern, (3) acknowledged that he was probably wrong to clash with Dr. Schaefer because the latter is a dignified gentleman and a scholar, (4) and stated that his view of the senior residency job was to have independence, otherwise there was little difference between a junior and a senior resident. I identified to him that it was (1) a serious mistake for a resident to get into arguments with and disregard directions of the chief and assistant chief of a service insofar as they are the 'boss', and (2) that he was using poor clinical judgment which was a danger to the public and, therefore, would threaten his California license and his qualifications for certification by the Board. *I asked him specifically if he wanted to save the year and remain in the program. He answered yes.* I then spelled out for him the following, *if he wanted to stay in the program*: (1) he must forget his 'independence' and change his behavior, (2) he must do what he is told to do and do it well, (3) he must consult with Ahern and Schaefer on all cases, (4) he would be wise to seek a buffer member of the faculty such as Dr. Veinbergs or Dr. Sandell with whom to work (scrub with) in order to gain some sort of favorable commendations, (5) he must get off 'probation' and get reinstated as chief resident as soon as possible in order to save the year, and (6) he must get to work, do what he is supposed to be doing rather than just what he wanted to do.

"DR. MARMION was again placed on probation by Dr. Ahern on or about March 14, 1980. On March 24, 1980, I had another long talk with DR. MARMION to discuss the differences, dissatisfactions, and grievances between the HOSPITAL and DR. MARMION. During the course of that lengthy conversation, *I reminded* DR. MARMION *that his position in the residency program was already seriously jeopardized. . . .*"

*Schaefer's declaration in pertinent part states*:

"I knew that DR. MARMION was first placed on probation by the Director of the program, Dr. Ahern, on November 6, 1979. I had occasion several times to discuss with DR. MARMION his probationary status and the reasons therefor. On more than one occasion, I told him in effect: 'Pat, you are jeopardizing your career.'

"In January, 1980, during a noon conference with residents in the program, DR. MARMION proposed a complete revision of program procedures. . . . When he was told by Dr. Ahern and myself that his reorganization plan would completely disrupt the program, would be detrimental to patient care, and was totally unacceptable to Ahern and myself (as administrators of the program) DR. MARMION said, 'I resign' and left the room. I followed him and told him that resigning would *jeopardize his career* and would not permit him to take his Boards (examinations by the American Board of Obstetrics and Gynecology) or practice as a specialist. DR. MARMION said that he did not care, that he could practice without taking his Boards, and that he did not need his Boards.

"On March 12, 1980, a dispute occurred between Dr. Ahern and DR. MARMION with

immediate supervisor, Ahern, was placing him on probation. The broad terms of probation also put him on notice his residency was in jeopardy.

The administrative record shows that before the April 3, 1980, hearing of the OB-Gyn residency review committee, Dr. Ahern had advised Marmion of both the general charges against him as well as representative cases which support the charges. He was thus well advised he was on a collision course with the program and termination was the inevitable result of his continued objectionable conduct. Perkins' order of suspension added further emphasis that termination was a real probability. All of the counseling and the discussion which preceded the April 3 meeting provides substantial evidence there was actual notice prior to the hearing. Marmion's contention he lacked notice of the charges is plainly without merit.

■ Marmion also contends he lacked the opportunity to respond to the decision-maker. Although he responded to the charges against him at the April 3 hearing of the residency review committee at which Dr. Perkins

respect to a certain departmental management decision relating to consultations by anesthesiologists. Dr. Ahern said to DR. MARMION: 'You're fired' and cancelled the conference. Later that afternoon, DR. MARMION came to my office and asked me what to do. I reminded him that I had spoken with him on numerous occasions in the past, making suggestions as to what he should do *so as not to jeopardize his chances of completing his residency.* I said that he had not heeded my advice. He again asked whether I thought he was fired. I told him that I had heard Dr. Ahern say that he was fired and suggested to him that he call Dr. Ahern and apologize *'or he might be out of the program and not be able to finish his residency.'* I called Dr. Ahern as soon as DR. MARMION left my office and asked him to accept the apology and to give him another chance.

"I was present at a meeting between DR. MARMION and Dr. Ahern on March 14, 1980, at 9:00 a.m. DR. MARMION had requested that I attend the meeting. Dr. Ahern told DR. MARMION that if he did not change his tactics, he would not be approved for the Boards and that he would again be placed on probation. DR. MARMION stated that he was doing everything correctly and that he would not change his ways. At this meeting, I mentioned to DR. MARMION again that what he was being asked to do was nothing that any other resident in any program would be asked to do and that he was not following the orders or instructions of the Director of the service. I again informed him at this occasion that he was *'jeopardizing his career.'*

"Based upon the foregoing facts within my personal knowledge, it is extremely difficult, if not impossible, for me to believe that DR. MARMION did not have notice that his termination from the Ob-Gyn Residency Training Program was a possible consequence of his failure to rectify the conduct which resulted in his twice being placed on probation and in a summary suspension."

Counsel for Mercy at oral argument indicated Marmion had *constructive notice* of his contemplated termination as indicated by the following facts: Marmion had been placed twice on probation and once on suspension. The April 3, 1980, hearing before the OB-Gyn residency review committee was to resolve Marmion's probationary and suspended status and to respond also to his grievance.

Obviously, the only two possible resolutions were either to terminate Marmion or remove the sanctions and allow him to finish his training. Given the gravity of the written and oral notices and the seriousness of Marmion's precarious relationship with Mercy and the residency program administrators, constructive notice appears to exist. We do not decide whether constructive notice is sufficient to satisfy the fair procedure requirements. In the present case, substantial evidence (i.e., the declarations of Perkins and Schaefer) supports the finding Marmion had *actual* notice before the critical date of the April 3, 1980, hearing before the OB-Gyn residency review committee.

was present, he claims the medical education committee was the final decision-maker and he was not given an opportunity to present evidence at their meeting. His position is without merit.

The residency review committee was simply a subcommittee and gave the latter committee its recommendations. Similarly, the medical education committee, after reviewing the recommendation of the residency review committee, would then make a recommendation to the director of medical education. It is the director, Dr. Perkins, who makes the ultimate decision. He is the "decision-maker." The "opportunity to respond" aspect of fair procedure is a flexible and not a rigid concept. The requirement of a meaningful opportunity to respond to the charges may be satisfied by a "variety of procedures" including (in certain circumstances) a mere written response (*Pinsker II, supra,* 12 Cal.3d 541, 555-556). In this case, Marmion was permitted to address the charges, discuss the cases thoroughly and present evidence at the April 3, 1980, hearing, before Perkins and the residency review committee. It is significant the ultimate decision-maker, Dr. Perkins, participated fully at this hearing and heard Marmion's response to the charges. Marmion could have been represented by legal counsel at that hearing but chose not to, preferring instead to have the counsel of a member of Mercy's straff, Dr. Spethmann. It is significant, too, Dr. Spethmann stated the hearing was fair and "every opportunity was given for him [Marmion] to respond and present what he felt was important." Also important is the fact Perkins had on several occasions earlier discussed the problems with Marmion and had first-hand knowledge of the difficulties involved. We note, too, that before the termination on April 15, Perkins again called Marmion and discussed the situation, telling him of the adverse decision of the two committees.

We conclude Marmion was not denied his common law right of a fair procedure. The discussions and documents which preceded April 3, 1980, provided Marmion with the notice requisite for fair procedure. The hearing before the OB-Gyn residency review committee provided Marmion a fair and full opportunity to respond to the charges in the presence of Perkins, the final decision-maker. After the residency review committee recommended to terminate Marmion, he was afforded an additional procedural protection, namely, a review of the medical education committee. This committee also unanimously recommended Marmion's termination. Supplied with two unanimous committee recommendations to terminate, plus his own knowledge of Marmion and the situation, Perkins further discussed the problem with Marmion to hear his response to what Perkins intended to do. All of this occurred before Marmion was terminated. Thus, Marmion received notice of the possibility termination would result, of the general charges against him, and of specific patient cases and incidents which support the

general charges and justify the decision to terminate him. Further, Marmion received an adequate and meaningful opportunity to present his case and respond to the charges both at the committee hearing and with Perkins. He was not denied his right of a fair procedure.

■ Marmion also raised important questions of fair procedure pertaining to the hearing before the judicial review committee. He challenges the propriety of Mercy using additional incidents and patient cases (different from those used at the Apr. 3, 1980, hearing of the OB-Gyn residency review committee) to support the general charges. Marmion also questions the burden of proof allocation which required Mercy to make a prima facie showing and then shifted the burden to Marmion to prove by clear and convincing evidence that the termination decision was arbitrary, unreasonable, or not sustained by the evidence.

In *Ezekial* v. *Winkley, supra,* 20 Cal.3d 267, the leading California case involving a hospital's termination of a resident, the court indicated the resident's right to a fair procedure does not require the formal proceedings of a court trial or a rigid procedure which must invariably be observed (*id.* at p. 278). Rather, the court placed the initial responsibility on the *hospital* to devise practical methods of providing an adversely affected resident a fair procedure (*ibid.*). The court continued, stating: "The medical profession does not lack models from which the form of such 'fair procedure' rights may be adapted. Plaintiff attaches to his complaint Guidelines for the Formulation of Medical Staff By-Laws, Rules and Regulations (1971) Joint Com. on Accreditation of Hospitals), which provide for extensive hearings and internal appellate review in staff appointment and dismissal cases. [Citation.] The record does not disclose whether Kaiser subscribes to these guidelines, but we are advised that they are widely accepted by both public and private hospitals. [Citation.]" (*Id.* at p. 279.)

■ In *Anton* v. *San Antonio Community Hosp.* (1977) 19 Cal.3d 802, at pages 818 to 819 and 827, footnote 26 [140 Cal.Rptr. 442, 567 P.2d 1162], a case involving the nonreappointment of a hospital staff doctor, the court recognized that institutional guidelines such as the CMA-CHA Uniform Code of Hearing and Appeal Procedures (Uniform Code) are available to guide hospitals in providing adversely affected staff physicians with a system of fair procedure and review.

Neither *Anton* nor *Ezekial* requires a hospital to provide a resident in a disciplinary proceeding the full protections specified in the Uniform Code. To the contrary, *Ezekial* suggests a flexible hearing procedure is appropriate. It is noteworthy the very language of the Uniform Code indicates these more structured procedures apply only to "medical staff members or appli-

cants," and residents clearly are neither hospital staff members nor applicants. Therefore, this court declines to extend the application of the Uniform Code to residents.

 Mercy, which provided Marmion with all the requisite procedural protections in making the April 15, 1980, termination decision, was obviously not precluded from extending to Marmion additional procedures for the purpose of ensuring maximum fairness and compliance with the law. The Uniform Code was a readily available, convenient and time-tested means to achieve this goal. Although it may not have been necessary to grant Marmion a hearing before a judicial review committee, Mercy provided a double measure of protection to Marmion in doing so. Providing that safeguard to a resident's rights has merit.

After Perkins made the decision to terminate Marmion, Marmion was informed the hearing and review procedures of the Uniform Code would be extended to him. This notice was given in the May 13, 1980, letter to Marmion from Perkins and Zorn and gave Marmion adequate notice and time to prepare a meaningful response at the committee hearing. This letter also stated the specific acts or omissions (i.e., reasons) which formed the basis of the termination decision in language slightly different from but substantially equivalent to the original charges.

Despite the committee's name, the "Judicial Review Committee," it did not perform a *review* in the traditional sense. The function of this committee was not to review the record of the April 3, 1980, hearing of the OB-Gyn residency review committee and determine if that record supported the termination decision; rather, the committee proceeding was in the nature of a hearing de novo. Thus, the decision to terminate Marmion was final and effective subject to "review" by an independent hospital body in a new and full evidentiary hearing.

At this hearing, both Mercy and Marmion presented new evidence to support or refute the general charges. Mercy did not and could not simply rely on the many admissions of misconduct Marmion made at the April 3 hearing, but had the burden of presenting evidence sufficient to make a prima facie case in support of the director's decision to terminate. Rather than admitting his misconduct as he had done at the earlier hearing, Marmion forcefully and ably presented evidence and cross-examination designed to explain his conduct, refute the charges totally and impeach the credibility of opposing witnesses. Because the judicial review committee hearing was a full evidentiary hearing, it was not error for Mercy to specify in greater detail the instances which support the basic charges supporting Marmion's termination or to discuss and present evidence on all patient

cases or incidents which support the charges *so long as Marmion had adequate notice and time to prepare a meaningful response* for presentation at the hearing.[6] We find no error or unfairness to Marmion was created by admission of these incidents at the judicial review committee proceeding. To the contrary, Marmion received a significant and additional procedural protection in that he was permitted to expand his own defense.

We also find there was no error in the allocation of the burden of proof to Marmion pursuant to the Uniform Code. California case law specifically authorizes this procedure (see *Anton* v. *San Antonio Community Hosp.*, *supra*, 19 Cal.3d 802, 828).

As in virtually every trial or administrative proceeding, some errors or minor procedural and evidentiary deficiencies occur. These cannot be avoided. In Marmion's case, our careful review of the record shows some procedural shortcomings did occur. Nevertheless, Marmion was afforded a fair procedure, and we believe the deficiencies had no significant impact on Marmion's termination or his ability to pursue fully his administrative and judicial remedies.

■ Marmion next contends the court erred by amending its findings of fact and attributing the amendment to a clerical error.

In August 1981, the superior court entered its judgment and adopted its memorandum of intended decision as its findings of fact. In its findings, the court concluded it must apply the "independent judgment standard" in re-

---

[6]Marmion contends Mercy introduced evidence on incidents that were uncharged and which Marmion was unprepared to rebut. He cites nine examples. Our careful reading of the record indicates incidents 1, 2, 4 and 9 were in fact charged. Incident 5, except for an inaccurate date (stated as Mar. 13, 1980, and should have been Mar. 24, 1980), was also charged. Incident 3 was merely an evidentiary matter relevant to the charge of Marmion's "failure to check schedules and medical management decisions with faculty members." Incident 6, Marmion removed equipment (*sic,* supplies) from hospital premises, was stated in a letter from nurse DeCrescenzo and was introduced into evidence at the hearing. Marmion correctly points out this charge was not specified in the May 13, 1980, letter. However, we see no undue prejudice from this evidence. Marmion explained he used hospital supplies for making house calls on clinical patients. He produced counteraffidavits from patients who confirmed Marmion's explanation and spoke very favorably of Marmion, a dedicated doctor who was willing to treat a patient at home. Thus, there was no prejudice from this aspect (incident 6) of nurse DeCrescenzo's letter which was generally relevant to other points. Incident 7, Marmion called a conference on March 28 which conflicted with a scheduled sonogram discussion, was not a specifically charged incident but was very relevant to the general charge of insubordination and resistance to authority. Marmion appears to have a valid complaint regarding incident 7. But in light of the other evidence, we see no substantial harm which would alter the judicial review committee's end result of sustaining the termination decision. Incident 8, concerning Marmion's two years of residency in Cincinnati, was not discussed or introduced in evidence. Read in context, Marmion's contention as to this incident is totally devoid of merit.

solving whether the findings are supported by the evidence because the administrative decision substantially affects a fundamental and vested right of Marmion's (see *Anton* v. *San Antonio Community Hosp.* (*Anton I*), *supra,* 19 Cal.3d 802, 820-825). The court proceeded to review the administrative record and find "there is *substantial evidence* to support the findings and that the decision is supported by the findings" (italics added). In October 1981, the court "to correct a clerical error, amend[ed] its findings of fact . . . to provide the term 'weight of evidence' in the place of 'substantial evidence'" in order to conform to what it believed was the proper standard to use in deciding the merits of Marmion's appeal.

The court relied on the nonmedical case of *Pipkin* v. *Board of Supervisors* (1978) 82 Cal.App.3d 652 [147 Cal.Rptr. 502], and the 1977 decision of *Anton* v. *San Antonio Community Hosp., supra,* 19 Cal.3d 802. *Anton I,* at page 821, footnote 19, quotes *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 44-45 [112 Cal.Rptr. 805, 520 P.2d 29]: "'[I]f the order or decision of the agency substantially affects a fundamental vested right, the court, in determining under section 1094.5 of the Code of Civil Procedure whether there has been an abuse of discretion because the findings are not supported by the evidence, must exercise its independent judgment on the evidence and find an abuse of discretion if the findings are not supported by the weight of the evidence. If, on the other hand, the order or decision does not substantially affect a fundamental vested right, the trial court's inquiry will be limited to a determination of whether or not the findings are supported by substantial evidence in light of the whole record.'" This language is harmonious with Code of Civil Procedure[7] section 1094.5, subdivision (c), which states: "Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence; and in all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record."

In 1978, however, the Legislature responded to *Anton I* by enacting section 1094.5, subdivision (d) (*Anton* v. *San Antonio Community Hosp.* (*Anton II*) (1982) 132 Cal.App.3d 638, 649 [140 Cal.Rptr. 442, 567 P.2d 1162]). This statute, which became effective January 1, 1979, reads in pertinent part: "Notwithstanding the provisions of subdivision (c), in cases arising from private hospital boards . . . , abuse of discretion is established if the

---

[7]All statutory references are to the Code of Civil Procedure unless otherwise specified.

court determines that the findings are not supported by substantial evidence in the light of the whole record. . . ."

Thus, it is evident the court erred by following *Anton I* and section 1094.5, subdivision (c), rather than section 1094.5, subdivision (d) (see *Pick* v. *Santa Ana-Tustin Community Hospital* (1982) 130 Cal.App.3d 970, 980, fn. 6 [182 Cal.Rptr. 85]; *Anton II, supra,* 132 Cal.App.3d 638, 649) and by applying the independent judgment standard. Had the court applied the correct subdivision, it would have used the substantial evidence test. We find, however, substantial evidence supports the decision to terminate Marmion and the error of the trial court is nonprejudicial.

█ In Marmion's reply brief, he raises a final issue. He contends the court erred by admitting into evidence the minutes of various meetings of the residency review committee dealing with resident physicians' performance. These documents were exhibits A through M and were attached to Mercy's points and authorities opposing Marmion's petition for writ of mandate. At the June 2, 1981, hearing before the superior court, Marmion objected to some of these exhibits (A-D, F, G, J, K-M) but requested exhibits E and H to be admitted. Apparently, the minutes of the meetings designated exhibits E and H helped Marmion's contentions but the others did not. The court asked Marmion the ground for the objection, and Marmion's reply was the exhibits were not presented as evidence at any of the administrative level proceedings and admission of the documents would "sort of prejudice the court in favor of the hospital." Marmion again suggested exhibits E and H were relevant. The court admitted all of these exhibits, stating, "it would be manifestly unfair to receive some of the exhibits which were not utilized in the administrative hearing procedure and disallow others. Either they're relevant, or they're not, and if they are relevant, it appears they are all relevant."

In his petition for writ of mandate, Marmion contends the court must independently review the administrative proceedings. He contends he would be deprived of constitutional rights if the court fails to grant an independent review but, rather, applies the substantial evidence test under section 1094.5, subdivision (d). Whether the court believed this argument is unknown, but it is clear the court did erroneously employ the independent judgment standard as we have already discussed. If the independent judgment standard had been correct, the court could properly receive the documents into evidence (§ 1094.5, subd. (e)). But because the substantial evidence standard governed the case, relevant evidence not in the administrative record could be admitted to the reviewing superior court only if it was improperly excluded or could not have been produced in the exercise of reasonable diligence at the administrative hearing (*ibid.*; *City of Fairfield* v.

*Superior Court* (1975) 14 Cal.3d 768, 771-772 [122 Cal.Rptr. 543, 537 P.2d 375]; *Markley* v. *City Council* (1982) 131 Cal.App.3d 656, 662 [182 Cal.Rptr. 659]).

Although technically these documents should have been excluded by the court, we hold their admission was not error because Marmion failed to object on the proper ground (Evid. Code, § 353, subd. (b)). In any event, admission of these documents has no substantial effect on the decision and was not prejudicial (*ibid.*; see *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 303, p. 4286).

Judgment affirmed.

Staniforth, J., and Wiener, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 5, 1983.