Filed 5/20/14  De v. Catholic Healthcare West CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| MONYA DE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CATHOLIC HEALTHCARE WEST,<br><br>    Defendant and Respondent. | B247458<br><br>(Los Angeles County<br>Super. Ct. No. BC476429) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ruth Ann Kwan, Judge.  Affirmed.

Lyon Law, Geoffrey C. Lyon and Tyler M. Press for Plaintiff and Appellant.

Ballard Rosenberg Golper & Savitt, Linda Miller Savitt, Eric C. Schwettmann and Rami A. Yomtov for Defendant and Respondent.

_____

# INTRODUCTION

Plaintiff Dr. Monya De appeals from the judgment entered after the trial court granted a motion for summary judgment filed by defendant Catholic Healthcare West, now known as Dignity Health, doing business as St. Mary's Medical Center. After Dr. De's one-year employment as a third-year internal medicine resident in the residency training program at St. Mary's ended without Dr. De receiving full credit, she filed this action seeking damages for disability discrimination under the Fair Employment and Housing Act (FEHA; Gov. Code,[1] § 12940 et seq.), failure to engage in the interactive process and to accommodate, retaliation, and wrongful termination in violation of public policy. We affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

A.      *The Residency Training Program at St. Mary's*

St. Mary's employed Dr. De in its residency training program as a third-year resident seeking to fulfill the final year of her internal medicine residency. According to the Resident Agreement executed by the parties, the term of Dr. De's residency and employment was from July 1, 2010 to June 30, 2011, unless terminated sooner in accordance with other provisions of the agreement. Dr. De's residency training and employment in fact terminated on June 30, 2011, the end of the term of the employment agreement.

The residency program was accredited by the Accreditation Council for Graduate Medical Education (ACGME) and was affiliated with the David Geffen UCLA School of Medicine. The goal of a resident in the program was to complete the residency successfully in order to advance to the next level of training and to become eligible for

---

[1]      Statutory references are to the Government Code, unless otherwise identified.

the certifying examinations given by the American Board of Internal Medicine (ABIM). The program evaluated residents based on six competencies identified by the ACGME and ABIM: patient care, medical knowledge, professionalism, communication and interpersonal skills, practice-based learning improvement, and systems-based practice. Residents also had to comply with other requirements of the ACGME and ABIM, such as attendance at a minimum number of classroom lectures given by faculty members on topics related to internal medicine. The residency program included month-long rotations through selected major subspecialties of internal medicine, including hematology, nephrology, geriatrics, intensive care, and out-patient clinic service. Academic staff physicians, referred to as faculty, and voluntary teaching physicians, referred to as teaching attending physicians, taught and supervised the rotations.

In accordance with ACGME guidelines, the residency program at St. Mary's had a Clinical Competency Committee. The Clinical Competency Committee, which was made up of faculty members and teaching attending physicians, evaluated and counseled residents on their progress in the program, their prospects for advancement, and their eligibility for the ABIM certifying examinations. The Clinical Competency Committee also considered and imposed discipline such as probation, remediation and termination. In addition, the faculty members met weekly and discussed each resident's performance and progress. During the 2010-2011 academic year, when Dr. De was a third-year resident in the program, the faculty included the residency program director Dr. Chester Choi, as well as Dr. Joyce Yeh, Dr. Neill Ramos, and Dr. Sarah Strube. Dr. Ramos was Dr. De's faculty advisor.

B.	*Dr. De's Performance in the Residency Program Prior to Disclosing Any Disability Based on ADHD[2]*

In January 2011 Dr. Ramos met with Dr. De to discuss her performance in the residency program. Dr. Ramos expressed his concerns about Dr. De's performance in the six core competencies, particularly in the areas of patient care and professionalism. He told Dr. De that her patient notes did not conform to the standard SOAP format (an acronym for a method of documentation that stands for "subjective, objective, assessment, and plan") and that she lacked professionalism because of timeliness and attendance issues. Dr. Ramos believed that Dr. De's performance continued to decline after the January 2011 meeting and raised serious concerns about patient safety.

On February 2, 2011 Dr. Choi met with Dr. De to discuss the faculty's concerns about her performance. Dr. Choi advised Dr. De that faculty members had observed that she had been late or absent when they were presenting and discussing her patients, that she had lapses in knowledge regarding her patients' status and data, and that her performance continued to be unsatisfactory despite feedback and counseling from her faculty advisor and her faculty clinic attending physician. Dr. Choi acknowledged that Dr. De had experienced some health issues and that she had attempted to give notice of her absences, but Dr. Choi stated that the absences, tardiness, and inadequate preparation for attending rounds were continuing problems.

Dr. Choi and Dr. De signed a "Required Improvement" plan to address deficiencies in her professionalism and patient care. The plan stated that the resident program would tolerate "[n]o further tardiness or unexcused absences from required conferences, clinics, or rounds." The plan also called for "[s]ignificant improvement in patient care to at least satisfactory level (as evaluated by teaching attendings) to include comprehensive pre-rounding with interns and students, satisfactory knowledge of patient care data and status, and formulation of patient management plan to meet or exceed

---

**2**	ADHD is "attention deficit hyperactivity disorder." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1167; *In re Angela M.* (2003) 111 Cal.App.4th 1392, 1395.)

4

ABIM and residency standards in patient care competency as evaluated by teaching attendings." The plan further stated that the faculty would monitor Dr. De for four weeks and that if she did not show adequate improvement then the program would place her on probation, subject to review and action by the Clinical Competency Committee. The plan also gave Dr. De notice that residents could appeal any adverse action by following a procedure that included a meeting with the Clinical Competency Committee and the program director, where the resident could present his or her appeal with the assistance of a teaching attending physician of the resident's choosing.

Following his February 2, 2011 meeting with Dr. De, Dr. Choi observed that Dr. De's performance continued to falter and caused serious concerns among the faculty. On February 4 or 5, 2011, Dr. Strube, who was supervising Dr. De on a medical ward rotation, relieved Dr. De of her medical duties after Dr. Strube determined that Dr. De had given a patient contraindicated medication that adversely affected the patient's heart rate and Dr. De could not explain why she had prescribed the medication. Dr. Strube had also learned of an incident during the same week where Dr. De had ordered unnecessarily strong medication for a dialysis patient, and Dr. Strube had to cancel the order before the patient received the medication. Dr. Strube did not trust Dr. De's ability and found that her overall work performance was below the level of a third-year resident.

Dr. De had been scheduled to start her required rotation in the intensive care unit (ICU) in February 2011. The faculty concluded, however, that her presence in the ICU would pose a serious risk to patient safety. The ICU rotation was generally considered a high-stress rotation due to high patient acuity and less opportunity and ability of the faculty to supervise the residents.[3]

The residency program placed Dr. De on probation and assigned her to a special medical ward rotation known as "Team E" in order to address her competency

---

[3] Patient acuity in this context refers to "the severity of [the] patient's condition." (*Taylor v. Lone Star HMA, L.P.* (N.D.Tex. Jan. 23, 2009, No. 3:07-CV-1931-M) 2009 WL 174133, p. 1.)

5

shortcomings. Dr. Choi, Dr. Ramos, and other faculty members decided assigning Dr. De to Team E would allow her to continue her resident training and would permit the faculty to monitor and supervise her closely in order to ensure patient safety. During this assignment, St. Mary's gave Dr. De a reduced patient load and assigned her to work one-on-one with the attending physicians, as opposed to assigning her to a regular medical ward rotation where the residents worked with a resident-intern as well as a supervising attending physician. During this probationary period with Team E, however, Dr. De's lateness, professionalism, and patient care problems continued. Faculty members observed that Dr. De was deficient in her medical knowledge and her communication and interpersonal skills.

The next meeting was March 11, 2011. Dr. Choi and Dr. Ramos informed Dr. De that she was suspended from the residency program, pending a meeting of the Clinical Competency Committee. Dr. Choi, who was aware that Dr. De suffered from depression but was unaware that Dr. De had ADHD, asked Dr. De if she had been experiencing any symptoms of depression and suggested that she see her physician. When Dr. Choi asked Dr. De if she had depression, Dr. De said, "No."

On March 23, 2011 the Clinical Competency Committee met and discussed Dr. De's performance and whether she should be permitted to continue in the residency program. Dr. De was present with Dr. Jerome Devente, a faculty member chosen by Dr. De to advocate on her behalf. Dr. De and Dr. Devente were able to ask and answer questions and to present documents in response to the complaints and allegations against her.

The committee members who had served at various times as Dr. De's attending physician (including Dr. Choi, Dr. Ramos, Dr. Strube, and Dr. Yeh) spoke about her problems in the areas of professionalism, patient care, medical knowledge, communication, and interpersonal skills. The committee members "observed and discussed" the "following deficiencies": "Failure to attend or late arrival at required events such as morning report and noon conference"; "Difficulty in arriving at proper diagnoses for patients and identification of key clinical information"; "Incomplete and/or

6

inaccurate patient assessments"; "Incomplete or overly extensive patient care plans"; "Failure to perform 'pre-rounding' on her assigned patients"; "Unsatisfactory knowledge of patient care data"; "Lack of efficiency (i.e. in terms of timely completing patient notes and medical records, length of sessions with patients and ability to handle multiple patients simultaneously)"; "Poor communication/lack of follow through in that her paperwork was not completed and critical patient data was not communicated to others on her Medical Team or 'relief'"; "Lack of ability to prioritize, including failure to identify urgent medical issues and distinguish from other, less urgent issues"; "Lack of insight into her patient care problems"; and "Lack of supervisory skills stemming from her difficulty in supervising interns and medical students." After considering these issues, and the fact that there were only three-and-a-half months remaining in the academic year for Dr. De to demonstrate improvement, the Clinical Competency Committee recommended termination from the program.

On March 29, 2011 Dr. Choi informed Dr. De of the decision by the Clinical Competency Committee to terminate her from the residency program. He also advised her of her right to appeal the committee's decision. Dr. De appealed.

Prior to or during the March 23, 2011 meeting, Dr. De never disclosed that she had a disability that required accommodation and never mentioned that she had been diagnosed with ADHD. The Clinical Competency Committee was not aware of any ADHD diagnosis. Dr. De never disclosed to anyone in the residency program that she had been diagnosed with ADHD or requested an accommodation for any disability prior to the decision by St. Mary's to terminate her from the residency program. Dr. De did not discuss her ADHD diagnosis or condition with faculty or teaching attending physicians in the residency program prior to March 31, 2011.

C.      *Dr. De's Performance in the Residency Program After Disclosing*
        *a Disability Based on ADHD*

Dr. Choi learned for the first time that Dr. De had been diagnosed with ADHD when he received a copy of a letter dated April 11, 2011 from Dr. De's psychiatrist,

7

Joseph C. Lee, to Dr. De regarding how her ADHD could affect her performance in the residency program. On April 19, 2011 the Clinical Competency Committee met to discuss Dr. De's appeal, at which time Dr. Choi read Dr. Lee's letter to the committee. The committee discussed how to provide Dr. De with the accommodations she requested that would allow her to continue her residency training, while at the same time ensuring patient safety.

The Clinical Competency Committee decided to allow Dr. De to return to work under a restricted, highly supervised period of probation and to provide her with the accommodations that she requested, which included returning to work in the clinic and continued opportunity to receive direct feedback. Several considerations, discussed at length at the meeting, guided the committee's decision. These considerations included (1) because Dr. De would not be on a medical team while she was in the clinic, faculty members would be able to provide extensive monitoring, supervision, and feedback on her progress; (2) because patient needs and acuities were generally lower in the clinic, there would be reduced external stress on Dr. De; (3) because Dr. De would not have to conduct any pre-rounding on patients, she could arrive at work later and would work a reduced number of hours overall; and (4) Dr. De would have a reduced patient load in the clinic.

On April 27, 2011 Dr. Ramos met with Dr. De to discuss her return to work and the terms of her probation. Dr. Ramos explained that the Clinical Competency Committee had developed the terms and conditions of her probation and had noted competency issues relating to patient care, professionalism, medical knowledge, communication, and interpersonal skills. Dr. De and Dr. Choi signed a written probation agreement that summarized the evaluations and observations that led to Dr. De's probation, explained that, and how, Dr. De needed to improve, and outlined the possible outcomes or consequences for her continued participation in the residency program depending on her ability to make progress.

Dr. De returned to work. Dr. Ramos and Dr. Yeh had daily interaction with her. A number of different faculty members and teaching attending physicians also supervised

8

her in order to ensure the program obtained a broad assessment of her progress. As they had while Dr. De was on Team E, the faculty members and teaching attending physicians continued to provide her with direct feedback regarding her progress and performance. The faculty members also continued to discuss Dr. De's performance and progress at their weekly faculty meetings. They continued to observe that her performance was below that expected of a third-year resident.

On June 6, 2011 the Clinical Competency Committee met to assess Dr. De's status and performance. The committee heard from the faculty members and teaching attending physicians who had worked with Dr. De during her probationary period in the clinic. The committee found that, despite the accommodations provided to Dr. De, she was not performing at the level expected of a third-year resident and still had problems in the areas of patient care and professionalism. The committee found that Dr. De was not ready to work in the ICU,[4] still required close monitoring and supervision, had problems with her efficiency (in terms of assessing patients, handling multiple patients, and completing patient notes and other medical documentation ), and wrote patient care plans that were not at the level of a third-year resident. The Clinical Competency Committee concluded that Dr. De was not capable of practicing internal medicine without monitoring and supervision, a reduced patient load, and the other safeguards in her probationary clinical rotation. The committee also noted that the workload reduction and extra monitoring and supervision provided for Dr. De conflicted with the residency program's educational goals of developing the resident's ability to manage multiple patient care situations independently and simultaneously.[5] The committee determined

---

**4**    Dr. Yeh testified in his deposition: "[Y]ou can't place someone [in the ICU] who is not safe to take care of patients. Our primary concern—our first priority is that patient[s'] lives are not compromised. So the time frame is neither here nor there. First, is patient safety. Second, is residents' performance."

**5**    Dr. Yeh testified: "By May of the academic year, they are basically two months away from hanging their own shingle, and the other third-year residents needed very little supervision with how they would take care of patients. They would come to me with a

9

that Dr. De's performance and skill levels were unsatisfactory and that she had a particular deficit in patient care. On June 9, 2011 Dr. Choi advised Dr. De of the committee's conclusions.

Dr. De's Resident Agreement expired on June 30, 2011. Dr. De asked St. Mary's to give her credit for completion of specific rotations during her residency and to extend her contract in order to allow her to complete her residency training. Dr. De also appealed the June 6, 2011 conclusions of the Clinical Competency Committee, and she presented a proposal for those rotations for which she believed she was entitled to credit towards completion of the residency.

On July 25, 2011 the Clinical Competency Committee met to hear Dr. De's second appeal. Dr. De spoke and presented evidence regarding her performance and accommodations. The committee considered Dr. De's presentation and discussed whether she was able to practice internal medicine without additional monitoring and supervision and whether she was ready for a rotation in the ICU. The committee members continued to express their concerns regarding Dr. De's ability to provide good patient care and concluded that they could not recommend her to the ABIM as able to practice internal medicine. The committee then affirmed the conclusions reached at the June 6, 2011 meeting.

On August 15, 2011 Dr. Choi sent a letter to Dr. De informing her that she would receive credit for approximately six months of training. The residency program would give Dr. De credit for seven rotations, including general medicine consultations, geriatrics, ward medicine, gastroenterology, ambulatory medicine, hematology/oncology, and nephrology. Dr. Choi advised Dr. De that the Clinical Competency Committee "was not supportive of further training" and that it might require more than six additional months for her to demonstrate the ability to function as an independent practitioner of internal medicine.

plan. They already educated the patients of what needed to happen. And they could see a full load of patients, as was expected of a third-year resident. [Dr. De] was not to that point."

10

D.     *The Lawsuit*

Dr. De filed this action on January 9, 2012.  She alleged seven causes of action: (1) disability discrimination (§ 12940, subd. (a)), (2) failure to engage in the interactive process (§ 12940, subd. (n)), (3) failure to make reasonable accommodations (§ 12940, subd. (m)), (4) retaliation (§ 12940, subd. (h)), (5) medical leave retaliation and discrimination (§ 12945.2), (6) failure to prevent discrimination (§ 12940, subds. (j), (k)), and (7) wrongful termination in violation of public policy.  Dr. De alleged that St. Mary's discriminated and retaliated against her by terminating her "on or about June 30, 2011" and "thereafter refusing to reinstate" her through July 25, 2011.

St. Mary's filed a motion for summary judgment or in the alternative for summary adjudication.  St. Mary's argued that Dr. De's first cause of action for disability discrimination failed because (a) Dr. De could not establish a prima facie case of disability discrimination, (b) St. Mary's had legitimate, non-discriminatory reasons for its actions with respect to Dr. De's residency employment, and (c) Dr. De did not and could not offer any substantial evidence that the reasons were pretextual.  St. Mary's argued that Dr. De's second and third causes of action failed because St. Mary's in fact engaged in a timely and good faith interactive process and gave Dr. De each accommodation she requested.  St. Mary's argued that the fourth and fifth causes of action failed because St. Mary's had legitimate, non-discriminatory reasons for its action and Dr. De could not establish any motive or intent to retaliate.  St. Mary's argued that Dr. De's sixth cause of action failed because Dr. De could not establish any FEHA violation and that her seventh cause of action for wrongful termination failed because Dr. De's one-year employment contract expired and she was not terminated.  St. Mary's also argued that Dr. De was not entitled to punitive damages.  Dr. De filed opposition papers, including declarations by Dr. De and excerpts of deposition testimony by the many percipient witnesses in the case.

11

The trial court ruled on the evidentiary objections filed by St. Mary's and granted the motion for summary judgment.[6] The trial court entered judgment in favor of St. Mary's, and Dr. De appealed.

**DISCUSSION**

A.      *Standard of Review*

We review a trial court's order granting a motion for summary judgment "de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party. [Citation.]" (*State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1017-1018; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) Code of Civil Procedure section 437c, subdivision (c), provides that a "motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (See *Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 618 [court may grant a summary judgment motion only "if no triable issues of material fact appear"]; *Aguilar*, *supra*, at p. 843.) We consider "'all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained'" (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534), viewing the evidence in the light most favorable to the plaintiff (*Aguilar*, *supra*, at p. 843).

A moving defendant "'"'bears the burden of showing the court that the plaintiff "has not established, and cannot reasonably expect to establish,"' the elements of his or her cause of action. [Citation.]" [Citation.]'" (*Ennabe v. Manosa* (2014) 58 Cal.4th 697,

---

**6**      Comparing the declaration Dr. De submitted in opposition to the motion with the evidentiary objections filed by St. Mary's, it appears that the declaration in the record is not the same as the declaration she filed in opposition to the summary judgment motion and to which St. Mary's made objections. In any event, Dr. De does not challenge any of the trial court's evidentiary rulings on appeal.

705; see Code Civ. Proc., § 437c, subds. (o) & (p)(1).) If the defendant meets this initial burden, then the burden shifts to the plaintiff to show that a triable issue of material fact exists. (See Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 849.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, *supra*, at p. 850, fn. omitted.)

    B.    *FEHA Standards*

FEHA prohibits discrimination in employment on the basis of specified criteria, including mental disability. (§ 12940 et seq.) Section 12940, subdivision (a), provides: "It is an unlawful employment practice, unless based upon a bona fide occupational qualification, . . . [¶] (a) For an employer, because of . . . mental disability . . . of any person, to refuse to hire or employ the person . . . , or to bar or to discharge the person from employment . . . , or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." FEHA, however, "does not prohibit an employer from . . . discharging an employee with a . . . mental disability, . . . where the employee, because of his or her . . . mental disability, is unable to perform his or her essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger his or her health or safety or the health or safety of others even with reasonable accommodations." (§ 12940, subd. (a)(1); see § 12926, subds. (f), (j); § 12926.1, subds. (b), (c); *Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215, 1222.)

FEHA also requires an employer "to make reasonable accommodation for the known . . . mental disability of an . . . employee," except an accommodation "that is demonstrated by the employer . . . to produce undue hardship . . . ." (§ 12940, subd. (m).) In addition, if an employer receives "a request for reasonable accommodation by an employee . . . with a known . . . mental disability . . . ," the employer is required "to engage in a timely, good faith, interactive process with the employee . . . to determine

effective reasonable accommodations, if any . . . ." (§ 12940, subd. (n).) In addition, an employer may not retaliate "or otherwise discriminate against any person because the person has opposed any practices forbidden under [FEHA] or because the person has filed a complaint, testified, or assisted in any proceeding under [FEHA]." (§ 12940, subd. (h).)

C. *Dr. De Failed To Establish a Prima Facie Case of Disability Discrimination or That St. Mary's Reasons Were Pretextual*

The elements of a cause of action for disability discrimination under FEHA (§ 12940, subd. (a)) are incorporated in a "three-stage burden-shifting test established by *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [36 L. Ed. 2d 668, 93 S. Ct. 1817]," which the California Supreme Court has adopted. (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 214.) "Litigation of disability discrimination in the employment context proceeds in three stages. First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff meets this burden, the employer must offer a legitimate, nondiscriminatory reason for the adverse employment decision. Third and finally, the plaintiff bears the burden to prove the employer's proffered reason is pretextual. [Citation.]" (*Rope v. Auto-Chlor System of Washington, Inc.* (2013) 220 Cal.App.4th 635, 656; see *Harris*, *supra*, at pp. 214-215.)

"In the first stage, the plaintiff bears the burden to establish a prima facie case of discrimination. [Citation.] The burden in this stage is '"not onerous"' [citation], and the evidence necessary to satisfy it is minimal [citation]. On a disability discrimination claim, the prima facie case requires the plaintiff to show 'he or she (1) suffered from a disability, or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations, and (3) was subjected to an adverse employment action because of the disability or perceived disability.' [Citation.]" (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 159-160; see *Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 310.)

14

"FEHA requires employees to prove that they are qualified individuals under the statute . . . ." (*Green v. State of California* (2007) 42 Cal.4th 254, 258; see *Furtado v. State Personnel Bd.* (2013) 212 Cal.App.4th 729, 744 ["employee must establish that he or she is a 'qualified individual,' i.e., an employee who can perform the essential functions of the job with or without reasonable accommodation"]; *Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 970-971 ["'[i]n order to prevail on a discriminatory discharge claim under section 12940[, subd. ](a), an employee bears the burden of showing . . . that he or she could perform the essential functions of the job with or without accommodation (in the parlance of the [ADA[7]], that he or she is a qualified individual with a disability)'"].) "By its terms, section 12940 makes it clear that drawing distinctions on the basis of physical or mental disability is not forbidden discrimination in itself. Rather, drawing these distinctions is prohibited only if the adverse employment action occurs because of a disability and the disability would not prevent the employee from performing the essential duties of the job, at least not with reasonable accommodation. Therefore, in order to establish that a defendant employer has discriminated on the basis of disability in violation of the FEHA, the plaintiff employee bears the burden of proving he or she was able to do the job, with or without reasonable accommodation." (*Green*, *supra*, at p. 262, italics omitted.)

St. Mary's demonstrated that Dr. De could not perform the essential duties of a third-year resident with or without reasonable accommodation and could not "perform those duties in a manner that would not endanger . . . the health or safety of others even with reasonable accommodations." (§ 12940, subd. (a)(1).) St. Mary's submitted evidence that the medical faculty and attending physicians determined that Dr. De was not qualified to perform the essential functions of a third-year internal medicine resident and that patient safety was a constant concern during Dr. De's residency. The Clinical Competency Committee determined in June 2011 that, even after St. Mary's had given

---

**7** ADA stands for the Americans with Disabilities Act of 1990. (42 U.S.C. § 12101 et seq.)

15

Dr. De the accommodations she requested for her disability, her overall performance was unsatisfactory and she was not capable of practicing internal medicine even with the accommodations in the clinic rotation (e.g., close monitoring, constant supervision, and a reduced patient load). Moreover, the accommodations she requested and received conflicted with the educational goals of the residency program, which were to train the residents to be doctors who were independent and did not require constant monitoring and supervision. Allowing Dr. De to work in the ICU, a requirement to complete a third-year internal medicine residency, created an unacceptable risk to patient safety. When the Clinical Competency Committee considered Dr. De's second appeal in July 2011, the committee members remained concerned about her competency and the safety of patients.

Dr. De did not offer sufficient evidence that she was able to perform the essential duties of her job, with or without accommodation. She did not cite to any evidence in her separate statement that she was able to perform the duties of a third-year resident. The evidence she did cite to did not support her position. For example, Dr. De stated in her separate statement that once she adjusted to her medication, there was a "drastic reduction in purported errors" she made. In the deposition testimony she cited in support of this statement, however, her attorney asked Dr. Yeh, "Would you say that from May 2011 to June 2011, [Dr.] De's work performance was about the same, better, or worse than other third-year students?" Dr. Yeh answered, "Worse." Dr. De also cited to an excerpt of her deposition testimony, but she did not submit that portion of her deposition in opposition to the motion for summary judgment. Dr. De did state in her declaration in opposition to the motion that "[u]pon my return to work, Employer failed to notice my regular and consistent improvements," and that "[o]ther residents have made significant errors, but have not been as excessively or unfairly criticized, suspended, or terminated as I was." The trial court, however, sustained the evidentiary objections by St. Mary's to these statements, and Dr. De has not challenged those rulings on appeal. Dr. De asserts in her brief on appeal that she "offered evidence, which was undisputed by [St. Mary's], that once Dr. De had been allowed time to adjust to her ADHD treatment and medication

16

she made no errors warranting termination.  After Dr. De was treated her tardiness to lectures stopped . . . and Dr. De received no complaints about her performance.  Once placed in the clinic rotation, Dr. De was able to meet the essential duties of the job."  Dr. De, however, does not cite to any evidence in the record supporting these statements.

Dr. De also did not meet her burden of showing that St. Mary's reasons for not extending her employment were pretextual or that St. Mary's acted with discriminatory animus.  "'[T]o avoid summary judgment, an employee claiming discrimination must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.'  [Citation.]"  (*Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 755.)  "'An employee in this situation can not "simply show the employer's decision was wrong, mistaken, or unwise.  Rather, the employee '"must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' [citation], and hence infer 'that the employer did not act for the [ . . . asserted] non-discriminatory reasons.' [Citations.]" [Citations.]' [Citation.]"' [Citation.]" (*Batarse v. Service Employees Internat. Union, Local 1000* (2012) 209 Cal.App.4th 820, 834; *McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 389.)  Dr. De failed to make any such showing.  (See *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 361 ["an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory"].)  Dr. De argues on appeal that she "offered evidence of pretext in four forms," but she does not cite to any evidence in the record in support of her argument.

D.  *Failure to Engage in the Interactive Process*

"FEHA provides an independent cause of action . . . for an employer's failure to engage in a good faith interactive process to determine an effective accommodation, once one is requested," as required by section 12940, subdivision (n).  (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 54.)  Thus, it is a separate violation of FEHA "[f]or an employer . . . to fail to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee . . . with a known . . . mental disability . . . ."  (§ 12940, subd. (n); see *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 424.)  "'The "interactive process" required by the FEHA is an informal process with the employee or the employee's representative, to attempt to identify a reasonable accommodation that will enable the employee to perform the job effectively.  [Citation.]  Ritualized discussions are not necessarily required.' [Citation.]"  (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1013.)  The responsibility for initiating the process and determining a reasonable accommodation rests with the employee.  (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 443.)

St. Mary's submitted evidence that, beginning in April 2011 when Dr. De first informed Dr. Choi and the Clinical Competency Committee of her ADHD diagnosis, there were numerous efforts by St. Mary's, including by members of the committee, faculty members, and attending physicians, to make reasonable accommodations for Dr. De.  Dr. De gave Dr. Choi and the committee a copy of the April 11, 2011 letter from her personal physician, Dr. Lee, stating the diagnosis and making several suggestions for accommodations for Dr. De.  Dr. Lee's suggestions included that Dr. De work in an outpatient clinic or other structured situation, that faculty members give Dr. De specific performance expectations, and that Dr. De have additional opportunities to meet with the attending physicians on her clinical rotations.  On April 19, 2011, the committee discussed these proposed accommodations and agreed to all of them.  Later in April 2011, her faculty advisor, Dr. Ramos, presented Dr. De with a written probation

18

agreement setting forth the expectations of the faculty for her during the probationary period. Dr. Choi also met with her to discuss the terms of her probation and to sign the probation agreement. When Dr. De returned to work, the interactive process continued. Dr. Ramos and Dr. Yeh had day-to-day interactions with Dr. De, as did the other faculty members and teaching attending physicians who supervised her, exactly as she had requested.

St. Mary's met its burden to provide evidence that it engaged in the interactive process. Dr. De did not provide evidence sufficient to raise a triable issue of material fact. Nor does she cite to any on appeal. Dr. De argues, without citing to any evidence, that she "requested the extension of her contract in order to allow her to finish her residency at St. Mary's," but she does not cite to any authority for her implied argument that St. Mary's failed to engage in the interactive process by refusing to enter into a contract extension, or to sign a new contract.

E.      *St. Mary's Did Not Fail To Make Reasonable Accommodations for Dr. De*

It is a violation of FEHA "[f]or an employer . . . to fail to make reasonable accommodation for the known . . . mental disability of an . . . employee. . . . (§ 12940, subd. (m); see *Gelfo v. Lockheed Martin Corp., supra*, 140 Cal.App.4th at p. 54 ["'[u]nder the express provisions of the FEHA, the employer's failure to reasonably accommodate a disabled individual is a violation of the statute in and of itself'"].) "'The elements of a failure to accommodate claim are similar to the elements of a . . . section 12940, subdivision (a) discrimination claim . . . . The plaintiff must, in both cases, establish that he or she suffers from a disability covered by FEHA and that he or she is a qualified individual. . . . [T]he third element [under a subdivision (a) claim] . . . establishing that an "adverse employment action" was caused by the employee's disability—is irrelevant to this type of claim. Under the express provisions of the FEHA, the employer's failure to reasonably accommodate a disabled individual is a violation of the statute in and of itself. [Citation.]' [Citation.]" (*Furtado v. State Personnel Bd.*, *supra*, 212 Cal.App.4th at pp. 744-745.) "'[R]easonable accommodation' in the FEHA

19

means . . . a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired." (*Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 974; see 2 Cal. Code Regs. § 11065, subd. (p)(1)(B) ["'[r]easonable accommodation'" includes "modifications or adjustments that are" "effective in enabling an employee to perform the essential functions of the job the employee holds or desires"].) "The elements of a failure to accommodate claim are (1) the plaintiff has a disability under the FEHA, (2) the plaintiff is qualified to perform the essential functions of the position, and (3) the employer failed to reasonably accommodate the plaintiff's disability. [Citation.]" (*Scotch v. Art Institute of California*, *supra*, 173 Cal.App.4th at pp. 1009-1010.)

As discussed, the evidence submitted by St. Mary's was that Dr. De was not a qualified individual because she could not perform the essential functions of her job with or without reasonable accommodation, and Dr. De did not create a triable issue of material fact on this issue. (See *Lui v. City and County of San Francisco*, *supra*, 211 Cal.App.4th at p. 985 ["trial court properly rejected plaintiff's discrimination and failure to accommodate claims on the basis that he was not a qualified individual able to perform the essential functions of the positions . . . even with reasonable accommodations"].) Moreover, also as discussed, the evidence submitted by St. Mary's showed that St. Mary's gave Dr. De every accommodation she requested upon her return to work in April 2011. The committee accommodated Dr. De by placing her in the less-stressful environment of a clinic rather than on a medical team so that she could receive more and direct monitoring, supervision, and feedback regarding her progress. The committee also relieved her of the obligation of pre-rounding so that she could come to work later, work less, and manage a reduced patient load.

Dr. De asserts that St. Mary's did not provide two other accommodations she requested: time off to adjust to her medications and an extension of her residency contract. Dr. De, however, never asked for the former, and the latter was not reasonable. Dr. De points to no evidence that she ever asked for or needed time off to adjust to the ADHD medication prescribed by Dr. Lee. To the contrary, St. Mary's first learned of

20

Dr. De's diagnosis from Dr. Lee's April 11, 2011 letter, which suggested that Dr. De did not need time off to adjust to her medication and stated that her medication change would allow her "to return to work . . . at the present time."

As for an extension of Dr. De's residency employment contract, we can see how, in some circumstances, additional time to complete certain employment tasks or course requirements may be a reasonable accommodation. A reasonable accommodation under FEHA may include job restructuring and part-time or modified work schedules. (*Furtado v. State Personnel Bd.*, *supra*, 212 Cal.App.4th at p. 745; *Raine v. City of Burbank*, *supra*, 135 Cal.App.4th at pp. 1222-1223.) Additional time off can also be a reasonable accommodation. (See *Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1193-1194; *Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 226.) In the academic setting,[8] additional time is a common reasonable accommodation imposed on an educational institution or examining body for medical and other graduate students with disabilities. (See, e.g., *Turner v. Association of American Medical Colleges* (2008) 167 Cal.App.4th 1401, 1410 ["[t]he ADA requires reasonable accommodations on standardized tests for those with qualifying disabilities"]; *Constantine v. Rectors & Visitors of George Mason University* (4th Cir. 2005) 411 F.3d 474, 478, 498-499 [law student with "'intractable migraine syndrome'" was entitled to additional time on final examination under the ADA]; *Gonzales v. National Bd. of Medical Examiners* (6th Cir. 2000) 225 F.3d 620, 626 [board of medical examiners has an "obligation to provide reasonable accommodations, including extra time" on examinations, to students with disabilities]; *Maples v. University of Texas Medical Branch at Galveston* (S.D.Tex. 2012)

---

[8] A residency program involves both employment and education. "'[A] resident is a categorical hybrid, being both an employee [citation] and a student [citation].' [Citation.]" (*Marmion v. Mercy Hospital & Medical Center* (1983) 145 Cal.App.3d 72, 85, quoting *Ezekial v. Winkley* (1977) 20 Cal.3d 267, 282; see *University of Southern California v. Superior Court* (1996) 45 Cal.App.4th 1283, 1290, fn. 7 ["[a]lthough [the resident] contends she seeks 'reinstatement of her employment contract,' her 'employment' was contingent upon her remaining a resident in good standing in the . . . training program"].)

901 F.Supp.2d 874, 883 [medical school reasonably accommodated physician assistant student's "ADHD by providing her with additional time and a distraction-free environment for tests" but did not have to allow her to retake the tests on which she performed poorly].)[9]

Here, however, extending Dr. De's contract would not have been a reasonable accommodation because there is no indication in the evidence that she ever would have been competent to treat patients in the ICU or would have been able to complete the remaining required hospital rotations. As the trial court concluded, "[e]xtending [Dr. De's] contract would have been an unreasonable accommodation in light of the threat to patient safety," and Dr. De "failed to submit admissible evidence showing she could have performed the job duties of a third-year Resident with the extension . . . ." Moreover, an extended residency with the accommodations she requested and needed (increased supervision, decreased patient responsibility, and reduced patient work load) would not have produced an independent resident physician within the objectives of the program. Even if St. Mary's had extended Dr. De's contract to give her an additional number of months "in order to allow her to finish her residency at St. Mary's," as she argues on appeal St. Mary's should have done, the conditions under which such an extension would have occurred were inconsistent with the goals and policies of the residency program.

F.      *Retaliation for Opposition to FEHA Violations and for Medical Leave*

"To state a claim of retaliation under FEHA, a plaintiff must show (1) he engaged in a protected activity, (2) he was subjected to an adverse employment action, and (3) there is a causal link between the protected activity and the adverse employment action. [Citations.]" (*Rope v. Auto-Chlor System of Washington, Inc.*, *supra*, 220

---

[9]      "'Because the ADA and FEHA share the goal of eliminating discrimination, we often look to federal case authority to guide the construction and application of FEHA . . . .' [Citation.]" (*Rope v. Auto-Chlor System of Washington, Inc.*, *supra*, 220 Cal.App.4th at p. 656.)

Cal.App.4th at p. 651; *Nadaf-Rahrov v. Neiman Marcus Group, Inc.*, *supra*, 166 Cal.App.4th at p. 989.)  Dr. De asserts that she suffered multiple adverse employment actions within a short period of time after she engaged in the protected activity of requesting reasonable accommodations.  These adverse employment actions included undeserved criticism beginning April 27, 2011, "termination immediately following her requested accommodation on June 30, 2011 and refusal to extend her contract in the July 2011 meeting."  She provides no further description of the actions and cites to no supporting evidence in the record, nor does she show a causal link between any requested accommodation and any specific adverse employment action.  (See *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 [plaintiff must show "a causal link existed between the protected activity and the employer's action"].)  Moreover, a request for an accommodation is not a protected activity under FEHA.  (See *Rope v. Auto-Chlor System of Washington, Inc.*, *supra*, 220 Cal.App.4th at p. 652 ["we find no support in the regulations or case law for the proposition that a mere request—or even repeated requests—for an accommodation, without more, constitutes a protected activity sufficient to support a claim for retaliation in violation of FEHA"].)

G.      *Failure to Prevent Discrimination*

"'[A]n employee who has not been discriminated against [cannot] sue an employer for not preventing discrimination . . . when no discrimination occurred . . . .'" (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284, 289.)  De's sixth cause of action for failure to prevent discrimination failed because her first cause of action for disability discrimination failed.

H.      *Wrongful Termination in Violation of Public Policy*

Dr. De does not argue that the trial court erred by dismissing her cause of action for wrongful termination in violation of public policy, and she has forfeited any issue relating to that claim.  (See *Estes v. Monroe* (2004) 120 Cal.App.4th 1347, 1352 [plaintiff forfeited appeal as to "cause[] of action by failing to brief, argue, or discuss" the cause of

23

action]; *Sanchez-Scott v. Alza Pharmaceuticals* (2001) 86 Cal.App.4th 365, 368, fn. 1 [plaintiff's failure to raise any argument in briefs as to one cause of action forfeited any issue on appeal concerning that cause of action].)  In any event, St. Mary's did not terminate Dr. De's employment, wrongfully or otherwise.  Dr. De's employment contract expired on June 30, 2011.

## DISPOSITION

The judgment is affirmed.  Defendant shall recover its costs on appeal.


SEGAL, J.[*]


We concur:



PERLUSS, P. J.



ZELON, J.


---

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.